UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: STANLEY A. GEHMAN and                    No. 13-10-13396 JA
       CATHY S. GEHMAN,

       Debtors.

PASCALE DOUGLAS,

       Plaintiff,

v.                                               Adversary No. 10-1157 J

STANLEY A. GEHMAN,

       Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court following a trial on the merits to determine the dischargeability of debt under 11 U.S.C. § 523(a)(2)(A). Plaintiff, Pascale Douglas, was represented by William Hoskovec. Defendant, Stanley A. Gehman, was represented by Dennis Banning. Plaintiff's claim arises from Defendant's sale of residential property to Plaintiff. As part of the sale of the property, Defendant signed a disclosure stating that there were no known defects in the home, including water leaks. Shortly after Plaintiff moved into the property, the roof leaked badly. In attempting to repair the leak, Plaintiff discovered that a suspended ceiling had been constructed in the living room, and that the vaulted ceiling it concealed and the roof showed extensive deterioration, including split rafters, evidence of prior leaks, and fire damage. In addition, the roof covering the vaulted ceiling was not structurally sound. Plaintiff contends that Defendant knew that the roof of the home was in poor condition and that he made a false representation to her by signing the disclosure stating that the home had no known defects.

After consideration of the evidence presented at trial, including the exhibits and testimony of the witnesses, and being otherwise sufficiently informed, the Court finds that the Defendant was unaware of the extent of the previous damage to the roof, that he made repairs to the home in good faith, and that he did not knowingly misrepresent the condition of the property to Plaintiff. Consequently, Plaintiff cannot sustain her claim of non-dischargeability under 11 U.S.C. § 523(a)(2)(A).

## FACTS

1. In the spring of 2008, Defendant Stanley A. Gehman purchased certain residential real property located at 1908 Sanford SW, Albuquerque, New Mexico (the "Property") for $79,500.00.

2. Defendant purchased the Property with the intent to fix it up and sell it for a profit.

3. The Property was a bank-owned property that had been vacant for some time.

4. Defendant did not obtain a full inspection of the Property when he purchased it because he planned to fix up whatever was required before attempting to sell it.

5. To finance Defendant's purchase of the Property and the anticipated repairs and improvements to the Property, Defendant obtained a construction loan from New Mexico Bank and Trust in the amount of $98,000.00.

6. An appraisal of the Property prepared for New Mexico Bank and Trust as of May 28, 2008 reflected a value of $145,000, as the estimated prospective market value for the Property as improved. *See* Defendant's Exhibit E. The appraisal reflects that the Property was built in 1979. *Id.*

2

7. Defendant did not do any of the construction work on the Property himself. The terms and conditions of his loan from New Mexico Bank and Trust prohibited him from performing the construction work himself.

8. When Defendant purchased the Property the center portion of the ceiling above the living room was vaulted and covered with textured and painted drywall.

9. Defendant walked through the Property and made handwritten notes for the repairs and improvements he planned to make to the Property. *See* Plaintiff's Exhibit 4. Defendant faxed these notes to Mike Ortiz, a general contractor, to request a bid. *Id.*

10. The handwritten notes include sketches of the rooms in the Property, remarks about the types of cabinets and finishes Defendant planned to use in the Property, and the following comments regarding the roof:  1) "repair roof (hip rafters)"; 2) "repair roof hip rafters"; 3) "repair rafters and dry wall"; 4) "brace low spots on roof"; 5) "install new shingles, sheeting where needed"; 6) "brace up roof"; 7) "repair bad roof sheeting"; and 8) "~~install~~ repair new ~~trusses~~ rafters over living room." Plaintiff's Exhibit 4; Defendant's Exhibit O.

11. Defendant made these notes because he had some questions about the roof and wanted to make sure that he discussed it with the contractor. Defendant could see from the outside of the Property that the ridgeline of the roof was sagged.

12. In May of 2008, Michael Ortiz/Zitro Construction prepared a proposal for work to be performed at the Property. *See* Plaintiff's Exhibit 3; Defendant's Exhibit O. The total amount of the bid was $32,292.00. *Id.*

13. At that time, Michael Ortiz was the owner of Zitro Construction Services, Inc. ("Zitro Construction").

3

14. Defendant hired Zitro Construction to perform work on the Property. *Id.* The Contractor Agreement signed by the Defendant and Michael Ortiz, on behalf of Zitro Construction, included the following provisions: 1) "[t]o the extent required by law all work shall be performed by individuals duly licensed and authorized by law to perform said work"; and 2) "contractor shall at its own expense obtain all permits necessary for the work to be performed." *See* Plaintiff's Exhibit 3; Defendant's Exhibit O.

15. Zitro Construction performed work on the Property, including the addition of material to brace up the roof and the installation of a suspended ceiling where the ceiling was vaulted.

16. Michael Ortiz testified that the ceiling was dropped to make the room look better cosmetically. *See* Exhibit 101 - Deposition of Michael Ortiz, p. 15, lines 16 – 22 ("it says 'raise some rafters.' That was an area where the rafter was - - the line coming down the roof was - - basically, it didn't look cosmetically good. So we adjusted and put a false, nonstructure, dropped ceiling in that area to cosmetically make that room a little better.").

17. Defendant did not see Mr. Ortiz or his crew doing the majority of the work on the Property.

18. The underlying roof structure was not visible when Defendant purchased the Property, nor was it visible when the suspended ceiling was installed, though Defendant testified that he saw one board being put up during the time Mr. Ortiz installed the suspended ceiling. Defendant did not see any split rafters.

19. During the time of the remodel, Defendant lived in Edgewood and worked twelve-hour night-shifts in Grants, a 212- mile round trip. Typically he would stop by the

4

Property on Friday on his way home from work to check on the progress of the work being done on the Property.

20. In his deposition, Mr. Ortiz testified that the work Zitro Construction performed was not structural, and did not require a permit. *See* Deposition of Michael Ortiz - Exhibit 101 , pp. 21 – 22; p. 24; p. 28 lines 5 – 11; p. 29 lines 11 – 14; p. 40, lines 3 – 12; p. 41, lines 2 – 7;  p. 46, lines 20 – 25; p. 47, lines 1 -4 and lines 18 – 24.

21. Defendant testified that Mr. Ortiz told him that he would get permits if they were needed, and that the work to be done was not structural and did not require a permit.   Defendant also testified that Mr. Ortiz told him that the bowing in the roofline was normal.

22. Defendant relied on Mr. Ortiz's assurances that the work he performed was not structural and did not require a permit.

23. Defendant ultimately fired Mr. Ortiz and Zitro Construction in November of 2008 because of mismanagement of the project.  *See* Plaintiff's Exhibit 9.   Defendant was frustrated with Mr. Ortiz because Mr. Ortiz was not returning phone calls or responding to Defendant's requests to complete the project.   Defendant believed that Mr. Ortiz secured a bigger job in Santa Fe and that he slacked off working on the Property after that time.

24. The work on the suspended ceiling was completed early on in the project, before Defendant became dissatisfied with Mr. Ortiz and Zitro Construction.

25. Defendant hired Reputable Plumbing and Heating, a licensed plumber to do all the plumbing work on the Property.

26. Defendant hired Padilla Electric, a licensed electrical contractor to do all of the electrical work on the Property.

27. Gilbert Padilla performed the electrical work on the Property, including wiring for two bedrooms, the kitchen, front living room, bathroom and utility room.

28. When Mr. Padilla first saw the Property, the vaulted portion of the ceiling was covered in sheetrock that was textured and painted.

29. Mr. Padilla obtained an electrical permit for the work he performed.

30. Mr. Padilla's electrical work passed inspection.

31. In the room in which Zitro Construction installed the suspended ceiling, Mr. Padilla ran some wiring for a fan and light switch. That work was performed after the framework for the suspended ceiling was installed.

32. Defendant replaced flooring, cabinets, countertops, appliances, and lighting fixtures in the Property.

33. Defendant spent about $56,000.00 to fix up the Property for sale. *See* Defendant's Exhibits H, I, J, K, L, M, and N; Plaintiff's Exhibits 5, 6, and 7.

34. Defendant retained Beth Beaver as his realtor to list the Property for sale.

35. Ms. Beaver listed the Property for sale in October of 2008.

36. The Property was advertised as "a darling remodel."

37. The first interested buyer, Erika Lopez, made an offer to purchase the Property and obtained a general inspection of the Property in January of 2009. *See* Defendant's Exhibit C.

38. The general inspection identified certain repairs that needed to be done to the Property, including certain roof repairs for damaged shingles. *Id.*

39. David Lujan, a licensed roofer, performed roof maintenance to the Property in response to the general inspection report. *See* Defendant's Exhibit D.

40. Ms. Lopez moved into the Property in January of 2009 under a lease-purchase agreement. Because she was ultimately unable to obtain financing, she did not close on the sale of the Property, and moved out in or around May of 2009.

41. During the time that Ms. Lopez lived in the Property, Ms. Lopez did not report any roof leaks to the realtor, Ms. Beaver. Nor did Ms. Lopez report any roof leaks in the Property to Defendant.

42. Plaintiff made an offer to purchase the Property from Defendant in May of 2009. *See* Defendant's Exhibit P.

43. Plaintiff was provided with a copy of the general inspection report for the Property prepared for Ms. Lopez. That report did not disclose any water leaks or fire damage.

44. Plaintiff chose not to get another inspection of the Property before closing on the sale.

45. Plaintiff purchased the Property for $123,000.00.

46. In connection with the sale of the Property to Plaintiff, Defendant signed and delivered to Plaintiff a Seller's Property Disclosure Statement.

47. In the Seller's Property Disclosure Statement, Defendant affirmatively stated that he was unaware of the following: a) any problems with interior walls, ceilings, doors, windows, floors, or attached floor coverings . . .; and b) any history of water leaks repairs of conditions involving water leaks, water infiltration, ponding under or around structure/crawlspace or other conditions which could be conducive to mold. *See* Plaintiff's Exhibit 8.

48. The Seller's Property Disclosure Statement has a section pertaining to roofs, gutters and downspouts. In that section the Defendant checked the box indicating that, to the

7

best of Defendant's actual knowledge, the roof had never leaked while he owned the Property. *Id.*

49. On the last page of the Seller's Property Disclosure Statement there is a section titled "Other" where the seller can list "any other information pertaining to the condition of the Property not addressed in the questions listed above." *Id.* This portion of the Seller's Disclosure Statement is crossed out. No additional information about the condition of the Property was disclosed in this section.

50. Plaintiff closed on the sale and moved in to the Property in July of 2009.

51. In September of 2009, Plaintiff experienced a very serious roof leak in the Property. She analogized the ceiling to a colander. Her fiancé removed the newly installed portion of the ceiling and the plaster that covered the vaulted ceiling.

52. The exposed roof under the vaulted ceiling revealed evidence of prior water damage, split rafters, and possible fire damage. *See* Plaintiff's Exhibits 16 – 43.

53. Frank Shultz, a licensed general contractor, inspected the Property after the damage occurred. He testified that the work performed on the Property from which the suspended ceiling was constructed consisted of supplemental roof bracing that was structural in nature, that the work would have required a permit, and that, in his opinion, if the work had been inspected it would not have passed inspection.

54. Steve Spensley, a licensed general contractor with thirty-two years of experience, also inspected the Property in 2010, after the extensive roof leak had occurred. Mr. Spensley testified that the supports that were added to the ceiling framing from which the suspended ceiling was hung transferred part of the weight of the roof to the ceiling framing. He testified

8

Case 10-01157-j    Doc 45    Filed 11/01/11    Entered 11/01/11 14:48:53 Page 8 of 13

further that the work performed on the Property was structural, was unsafe, and would definitely have required a permit.

55. An additional general inspection of the Property before the leak occurred would not likely have uncovered evidence of fire damage, the history of roof leaks, or the structural problems with the roof.

56. Defendant first learned of the leaking roof from Beth Beaver. He did not see the underlying roof structure before that time.

57. After learning of the leak, Defendant cooperated with Plaintiff by providing her a copy of the contract with Zitro Construction and by providing her with a copy of the handwritten notes describing the repairs and improvements he intended to make to the Property.

58. Defendant Stanley A. Gehman and his wife, Cathy Gehman, filed a voluntary petition under Chapter 13 of the Bankruptcy Code on July 3, 2010.

## DISCUSSION

Debts obtained by false representations, false pretenses, or actual fraud are non-dischargeable under 11 U.S.C. § 523(a)(2)(A).[1] A creditor seeking a non-dischargeability determination under this section bears the burden of proving, by a preponderance of the evidence, that: 1) the debtor made a false representation; 2) the debtor made the representation with the intent to deceive the creditor; 3) the creditor relied on the representation; 4) the creditor's reliance was justifiable; and 5) the debtor's representation caused the creditor to

---

[1] That section provides:
> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by –
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.
>
> 11 U.S.C. § 523(a)(2)(A).

9

sustain a loss.[2]   Here, the alleged false representation was contained in the Seller's Disclosure Statement.  Defendant signed the disclosure statement stating that to his knowledge there were no defects in the Property, when, in fact, the roof was structurally unsound, had a history of water leaks, and had fire damage.  If the Defendant did not know, or have reason to know, at the time he made the representation that there were any defects in the Property, Defendant's statement in the Disclosure Statement was true.

To satisfy the criteria for non-dischargeability of a debt, Defendant must have made a false representation with intent to deceive Plaintiff.  *Riebesell,* 586 F.3d at 791 (citing *Young,* 91 F.3d at 1375).   Intent to deceive can be inferred based on the totality of the circumstances surrounding the false representation. [3]  If the misrepresentation was made knowingly, the Court can infer that the misrepresentation was made with the requisite intent to deceive.  *See Young,* 91 F.3d at 1375 (acknowledging that intent to deceive may be inferred based on a "knowingly made false statement.")(quoting *Swanson v. Tam (In re Tam),* 136 B.R. 281, 286 (Bankr.D.Kan. 1992)(quoting *Henry v. McClure (In re McClure),* 99 B.R. 66, 69 (Bankr.D.Kan. 1986)(internal quotation marks omitted)).   Intent to deceive can also be established from circumstantial evidence that includes a defendant's reckless disregard for the truth or accuracy of the representations.[4]   But in order to conclude that the Defendant acted with the requisite fraudulent

---

[2] *See Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996)(the required elements under 11 U.S.C. § 523(a)(2)(A) are:  "[t]he debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss."); *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d. 351 (1995) (changing the standard of reliance under 11 U.S.C. § 523(a)(2)(A) from "reasonable" to "justifiable.").  *See also, In re Riebesell,* 586 F.3d 782, 789 (10th Cir. 2009)(same).
[3] *In re Abeyta,* 387 B.R. 846, 854 (Bankr.D.N.M. 2008)(citing *Young,* 91 F.3d at 1375).
[4] *In re Daviscourt,* 353 B.R. 674, 685 (10th Cir. BAP 2006)("Intent to deceive under this subsection [§ 523(a)(2)(A)] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth.")(citation omitted); *Blascak v. Sprague (In re Sprague),* 205 B.R. 851, 861 (Bankr.N.D.Ohio 1997)(acknowledging that "intent to deceive may be inferred from representations made in reckless disregard for their accuracy or truth.")(citations omitted).
 *See also, Driggs v. Black (In re Black),* 787 F.2d 503, 506 (10th Cir. 1986)(interpreting § 523(a)(2)(B), and stating

10

intent, there must be some indication as a whole that "'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'" *In re Davis,* 246 B.R. 646, 652 (10th Cir. BAP 2000)(quoting (quoting 3 William L. Norton, Jr. Norton Bankruptcy Law and Practice 2d § 47:16, n. 62 (1999)(citing *In re Devers,* 759 F.2d 751 (9th Cir. 1985)), *aff'd in part, vacated in part, and remanded by* 35 Fed.Appx. 826 (10th Cir. 2002)).

There is no doubt, based on the testimony and photographic evidence presented at trial, that the roof at the Property had serious damage at the time Defendant purchased the Property, including poorly repaired split rafters, a leaking roof, prior fire damage, and a structurally unsound roof. The evidence also established that the work performed by Zitro Construction was, in fact, structural in nature, and likely contributed to the serious leak Plaintiff experienced shortly after she purchased the Property. However, the evidence falls short of establishing that Defendant made a knowing misrepresentation of the condition of the Property with intent to deceive Plaintiff. Consequently, Plaintiff cannot sustain her non-dischargeability claim against Defendant under 11 U.S.C. § 523(a)(2)(A).

When Defendant purchased the Property, the ceiling was vaulted and covered with plaster. He did not see the rafters underneath the vaulted ceiling, the fire damage, or the wood roof deck. Defendant observed from the exterior of the Property that the roofline was sagging, but hired a contractor to address the problem. The contractor told Defendant that the sagging roofline was normal, undertook to brace the roof, and installed a suspended ceiling to improve the cosmetic look of the interior of the Property. He assured Defendant that the work he performed was not structural and did not require a permit. Defendant relied on the licensed contractor he hired. From Defendant's perspective, he hired a licensed contractor, a licensed

---

that "the requisite intent may be inferred from a sufficiently reckless disregard of the accuracy of the facts.")(citations omitted).

plumber, and a licensed electrician to make repairs to the Property to address any existing problems. He updated the fixtures and finishes in the Property in order to improve the Property for sale. There is no evidence that Defendant knew or should have known that the roof had serious problems. There is no evidence that the roof leaked from the time Defendant acquired the Property until Plaintiff experienced the leak in September of 2009. Defendant testified that this Property was his first (and likely last) attempt at buying a residential property to fix up for resale. He was not sophisticated in home construction or repair.[5]

"Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made." *In re Cooper,* 2011 WL 722537, *4 (Banrk.N.D.Ill. 2011)(citing *Mega Marts, Inc. v. Trevisan (In re Trevisan),* 300 B.R. 708, 717 (Bankr.E.D.Wis. 2003)(remaining citations omitted). Here, Defendant signed the Disclosure Statement representing that to the best of his knowledge there were no known defects in the Property. The surrounding facts and circumstances do not suggest that Defendant made a knowing misrepresentation, or that, by relying on the licensed contractor he hired to improve the Property, he acted with reckless disregard for the truth sufficient to infer intent to deceive.[6]

---

[5] The facts of this case starkly contrast with the facts in *In re Osborne,* 2010 WL 4117464 (Bankr.M.D.Fla. 2010), another case involving a non-dischargeability claim arising from statements contained in a seller's disclosure statement regarding the condition of the roof. In *Osborne,* the debtors observed evidence of water leakage and other damage to the roof, including water rot and termite damage. 2010 WL 4117464 at *2. The debtors undertook to complete their own repairs by covering some of the rotten wood with new beams and shingles, installing new plywood on top of existing shingles, and joining new wooden beams to damaged beams, despite not having any roofing experience and despite not having a license to perform roofing work. *Id.* Debtors did not consult a licensed contractor, and did not obtain any permits for the work. *Id.* Nevertheless, Debtors represented in the seller's disclosure statement that 1) they had no knowledge of termites or dry rot; 2) they were not aware of any improvements whether done by them, or others that were constructed without obtaining required permits; 3) they were not aware of any roof defects; 4) he roof had not leaked since they owned the property; and 5) they had taken actions to correct the roof. *Id.* at *4. They also represented that the roof had been replaced. *Id.*

Here, there is no evidence that Defendant saw the extent of the pre-existing damage to the roof. He did not attempt to make any repairs or improvements to the Property himself. He hired licensed contractors. He did not represent to Plaintiff that the roof had been replaced.

[6] *Cf. Sprague,* 205 B.R. at 861 (stating that "demonstrating 'gross recklessness' would warrant a finding of deceptive intent.")(citation omitted).

12

CONCLUSION

Based on the foregoing, the Court concludes that Plaintiff has failed to sustain a claim for non-dischargeability of debt under 11 U.S.C. § 523(a)(2)(A). The surrounding facts and circumstances are insufficient to infer that Defendant's subjective intent in signing the Disclosure Statement was to deceive Plaintiff about the condition of the roof on the Property. Because Defendant did not have the requisite intent to deceive, the Court need not address the elements of justifiable reliance and damages.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law issued in accordance with rule 7052, Fed.R.Bankr.P. A judgment consistent with this Memorandum Opinion will be entered.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: November 1, 2011

COPY TO:

**William Ervin Hoskovec**
Law Office of William E. Hoskovec, P.C.
Attorney for Plaintiff
PO Box 3700
Edgewood, NM 87015

**Dennis A Banning**
Banning Law Firm
Attorney for Defendant
10801 Lomas Blvd NE #104
Albuquerque, NM 87112